## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 23-CR-87(RBW)** |
| **JESSE WATSON** | : | |
| | : | |
| **Defendant.** | : | |

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

The defendant, Jesse Watson through his attorney, Nicole Cubbage, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), respectfully submits this memorandum to aid the Court at sentencing and hereby notifies the Court that she has received and reviewed the Presentence Report ("PSR") prepared in this case. After carefully reviewing the PSR with Mr. Watson, there are no unresolved objections. For the reasons set forth herein, Mr. Watson requests that this Honorable Court impose a sentence of a period of 15 days incarceration to be served on weekends, a period of community service, and restitution in the agreed amount of $500. Mr. Watson requests this sentence for the following reasons:

1.  His lack of need for incarceration in a prison setting

2.  His desire to complete his sentence, move forward past these events, and make amends quickly for his charges,

1

3.      His willingness to enter into a plea agreement in this case and

accept responsibility and move swiftly to resolve these charges;

4.      His long history of a strong work ethic which has allowed him to be

a productive member of society, a decorated Army veteran and his

recent out-of-state move to begin a job in July of 2023;

5.      His lack of preparation or planning prior to January 6, 2021 to be

part of the Capitol breach

6.      His relatively short twelve (12) minutes inside the Capitol and his

willingness to leave as directed; and

7.      His peaceful, non-destructive and non-violent behavior that day

both outside and inside the Capitol building.

## I.      **Background**

Mr. Watson comes before the Court having plead guilty to count 4 of the

Information charging him with a violation of Title 40 U.S.C. §5104(e)(2)(G).   The

sentencing guidelines do not apply to this Class B misdemeanor offense. The

government will dismiss the remaining counts at the time of sentencing. There is

no mandatory minimum; the maximum sentence of imprisonment is six months.

Mr. Watson signed a detailed statement of offense in which he admitted that he

entered the U.S. Capitol building through the Senate Wing doors, traveled through

the Crypt, and exited after about 12 minutes total inside the building.  He did not

cause any damage, nor did he engage in any acts of violence. He did not enter the Senate Room floor, nor did he enter any private offices. He cooperated with law enforcement when asked to do so and exited the Capitol when directed and in a manner directed by law enforcement.

## II.    <u>Watson's Arrest and reasons for traveling to DC on January 6th</u>

On October 19, 2022, Mr. Watson woke up to his door being kicked in by the FBI.  Mr. Watson looked out the window and saw a yard full of guys dressed in camouflage holding rifles and assault weapons.  He was scared to death.  He opened the front door and walked out to a scene right out of something he'd seen in Iraq during his time as a decorated veteran in the Army. There was an armored personnel carrier parked there, countless officers, lights flashing, guns drawn and across the street Mr. Watson thought there was someone with a camera appearing to film the whole event.   For approximately two hours he stood outside in his underwear, embarrassed, disoriented, handcuffed and not allowed to sit down. Thereafter he was taken into custody and delivered to the Federal building in Seattle   There he was held for 8 hours and then released.  Mr. Watson, though exercising his right not to give a statement to the FBI, nevertheless cooperated with the FBI agents that day and despite the way he had been treated by them.  He willingly gave them the combination to his gun safe in his house and the safe in his car.   The house was seriously damaged that day by law enforcement, to include

burns to his carpet from the flash bangs used to scare and awaken him.  When he returned home, he found his house in shambles and his door wide open.  At the time of the arrest, Mr. Watson told law enforcement there was no need to send a SWAT team like that because he would have willingly turned himself over if they had only reached out beforehand.  It seemed, to Mr. Watson, a very extreme way to make initial contact with a defendant charged with four misdemeanors.

It is necessary to understand what was happening in our country at the end of 2020 to set the stage for why Mr. Watson and others came to hear President Trump's speech on January 6th, 2021.  After the 2020 Presidential election, sources of media, both online and otherwise, made claims that the election system had been corrupted and that the integrity of the election could and should be questioned. We know now that the former President will face criminal charges in this courthouse for this very conduct in questioning those results.  The media reporting, from both sides of the political spectrum, undermined confidence in the democratic process by leaving certain questions unanswered, calling each other names, and dismissing claims from sources that seemed to have legitimate issues.  Mr. Watson, like many other concerned Americans, wanted the truth to be investigated and for the election to be proven fair.

Mr. Watson is a high school graduate and former army mechanic. He has been working for approx. ten years as a security access professional, installing

access control and cctv for private companies.  He is 34 years old.   At the time Mr. Watson came to DC for the Trump Rally he had just turned 32 years of age less than a week beforehand.

Mr. Watson came from Seattle to D.C. to attend the Trump Rally to have his voice heard about election integrity and he wanted to be counted as a concerned citizen.   As a former Army veteran, he had served our country in Iraq and received decorations and medals for his willingness to serve.  Mr. Watson wanted to attend the Rally on the Ellipse to show his support of Trump and his concern that the election had not taken place in a fair manner.  He wanted to exercise his First Amendment rights to protest and voice his concerns.  These were the same rights he had been willing to fight to protect for all American citizens, regardless of their political affiliation. as a member of our military.

Mr. Watson had no idea that when he walked down Constitution Ave towards the Capitol om January 6th that others had already broken down that restricted perimeter long before the President had even finished his speech.  When Mr. Watson arrived to the Capitol, his pathway was unobstructed all the way to the western terrace.  He came to the Capitol with no intent to do anything but add his voice to the many who were concerned about election integrity.  When he arrived he saw crowds of people waving flags, sounding air horns and chanting.  There was a sea of people all around and an atmosphere of patriotism and chaos but not

that different from what Mr. Watson had seen during 2020 with other protests that had taken place in or country.

Mr. Watson thought he was attending a First Amendment assembly as he approached the Capitol grounds.   He did not suit up for combat.  He did not obscure his face – though he wore a covid mask at times.  He was not armed.  He wore street clothing. He did not carry anything but a phone to film what he was seeing.  He came with a friend, not as part of an organized group.  He committed no violent actions in his 12 minute walk through the Capitol.  He did not destroy anything and he left when directed by law enforcement.  He now stands before this court admitting that he had reason to know at the time he entered the U.S. Capitol that the building was restricted, and that he did not have permission to enter the building and acknowledges that he paraded, demonstrated, and picketed while inside the U.S. Capitol Building.

### III.   Mr. Watson outside and inside the Capitol

Mr. Watson never imagined going to the Capitol that day and certainly never thought that violence would follow.   When he arrived at the Capitol grounds after hearing Trump speak, he arrived to people already pressed forward towards the inaugural stage. (See Figure 1 below from ECF 42).



*Figure 1*

He does not condone the violence that occurred that day in any way and regrets being there at all.   He did not engage in any altercations with law enforcement officers outside on the grounds, and moved around on the grounds to several different locations trying to stay away from areas where he saw people getting up in the faces of law enforcement officers.  As a result of his frequent movement around the grounds and the crowds pressed in on him, he doesn't recall seeing violence between officers and protestors first hand, but realizes now that this did occur.

As he made his way towards the north side later in the day, around 3pm, he saw people gathering on the West Terrace where it seemed to be peaceful and open

to the crowds.  Figure 2 below shows what the scene was like on the upper west terrace at approximately 2:59pm on January 6th, about the time Mr. Watson arrived to the area.  He arrived from the left-hand side of the frame below where a yellow arrow marks the area.  He made his way up to the window area circled in yellow underneath the brick arches through a tightly packed crowd of protestors.



*Figure 2*

The Senate Wing Doors were under those arches, but he didn't see them until he got closer.  At approx. 3:09pm, Mr. Watson had made his way close enough to see that the doors were open and he entered up a ramp and walked in to the Capitol building though those open doors and unobstructed pathway inside. (See figure 3 below, from ECF 42).



*Figure 3*

 Law enforcement officers were standing in the area, but they did not direct

people to leave at any time Mr. Watson was in this vicinity.   In fact, we know

from other cases that these officers practiced what they called "verbal judo" that

day, which was to make the protestors feel at ease and not to confront them or ask

them to leave.  In figure 3 the officers can be seen engaging in conversations with

the protestors at the back and side of the foyer.  They do not appear to be telling

anyone to leave or engaging in any type of process to remove the people inside the

building.

 Mr. Watson made a turn to his right when he entered, following a crowd of

others down the hallway not really knowing where he was heading.  He found

himself in the Crypt of the Capitol a few minutes later at approximately 3:12pm.

There he unsuccessfully tried to help someone hang a flag on a pillar with tape.
An officer asked them not to hang the flag and thereafter Mr. Watson left the area.
At 3:21pm Mr. Waston left the building as directed by officers standing by a
window in the Senate Wing Door area.  See figure 4 below from ECF 42 showing
the approximate time of Mr. Watson's exit at 3:21pm.



*Figure 4*

## IV.  Legal Standard

Section 3553 of Title 18 of the United States Code enumerates certain
factors a district court is to consider when sentencing a defendant who has been
convicted of a federal offense. Primarily, the court shall consider the nature and
circumstances of the offense and the history and characteristics of the defendant.

*See* 18 U.S.C. § 3553(a). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D). 18 U.S.C. § 3553(a) sets forth seven factors which a sentencing court must consider:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to reflect the four primary purposes of sentencing, i.e., retribution, deterrence, incapacitation, and rehabilitation;
>
> (3) the kinds of sentences available;
>
> (4) the sentencing range established through application of the sentencing guidelines and the types of sentences available under the guidelines;
>
> (5) any relevant "policy statements" promulgated by the Commission;
>
> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

### A. Nature and Circumstances Of The Offense

### 1. **Pre-January 6, 2021**

Mr. Watson came to Washington, D.C. to see President Trump's speech at the Ellipse and to show his concern about election irregularities.   He did not come to Washington, D.C. with the intention of subverting democracy; Mr. Watson came to our Nation's Capital to peacefully protest what he believed at that time to be a fraudulent election.

### 2. **January 6, 2021**

By the time Mr. Watson arrived at the U.S. Capitol grounds on January 6, 2021, the barriers that had been erected along the perimeter of the Capitol's west lawn area were no longer present. Mr. Watson met no resistance in his walk to and inside the Capitol building, through the Senate Wing Doors and then out a window near those doors 12 minutes later. He remained in the U.S. Capitol building for approximately 12 minutes, and followed the direction of law enforcement to leave when directed. Most of this time he was in the Crypt –he tried to help someone with a flag they were attempting to hang– and then he left the building through the window near the Senate Wing doors.

Mr. Watson recalls that while inside the Capitol building, the mood was like other protests in Washington, D.C. – which he had previously seen on TV.  People

were taking selfies, and for the most part, appeared to be peacefully taking photos, waving flags, and walking throughout the area. After watching video clips of January 6th after-the-fact, Mr. Watson regrets that he was any part of it.  He is upset that some violent protesters assaulted police officers and caused property damage to the U.S. Capitol.  As a veteran, who served our country honorably, he did not agree with that behavior and regrets that anyone was hurt.

Mr. Watson was not part of a group that organized activities on January 6th nor does he subscribe to any far-right political views. He had no idea where he was while he was in the Capitol building, was only briefly inside the building, and to this day could not navigate the building.

The government concedes that Mr. Watson committed no violent acts and destroyed no property. His actions within the U.S. Capitol have been tracked on the CCTV footage and this demonstrates that while unlawfully present in the Capitol with no excuse, he did not destroy property, steal property, commit violent acts, or encourage others to do so. Furthermore, Mr. Watson did not exercise managerial authority over any other participant, and he was average or minor participant.

### 3. Post-January 6, 2021

Mr. Watson pled guilty at a pre-trial stage in the proceedings thus saving valuable judicial resources, as well as the resources of the U.S. Attorney's Office. It is noted "During the presentence interview, the defendant agreed with the conduct described in the Statement of Offense as presented to the Court prior to his guilty plea." *See* PSR, ¶ 19.  Mr. Watson was represented by the late Mr. Gregory English during this stage of the proceedings.

Mr. Watson has endured life-long damage to his reputation, disruption to his work life and difficulty moving forward since the January 6th incident and his arrest. He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021 to commit violence and subvert democracy.  Mr. Watson was not at all there to do that, but the notion that he was there to hurt our country and the ideal for which it stands will forever have a lasting effect on his reputation and character.  Mr. Watson struggled to find a job because of his charges in this case and feels so fortunate to have found the job he currently started last month, requiring him to relocate halfway across the country. In fact, many prospective employers refused to call him back during his search for employment after he revealed his current situation.

## B. <u>History and Personal Characteristics of Mr. Jesse Watson</u>

Mr. Watson (age 34) was born in Bellevue, Washington.  His parents were divorced five years after he was born.  He spent his life being raised by both parents who split custody.  In his youth he moved around a bit to be with his parents and his grades suffered as a result.  It was only later in life, in fact just this past January 2023, that he was diagnosed with ADHD and started taking medication to treat this disorder.  This treatment has helped enormously for his ability to focus and improve his life.  Just this past month, July 2023, he as able to obtain a job in Nashville, TN in the security access industry.  He is proud of his work as a security access technician and is thankful for this employment opportunity.  He hopes that he can maintain this job and face whatever sentence this court imposes with little disruption to this new found success in his career and life.

Mr. Watson reports he is in good health and has no mental health history, though the recent ADHD diagnoses explains a lot about his struggles as a young man and his varied commitment to academic success throughout his life.  His time in the Army was important to him both personally and professionally.  It instilled discipline and structure and put Mr. Watson on a career path that he continues to develop today as a technician.  From October 8, 2008, to April 20, 2012, Mr. Watson was enlisted in the U.S. Army. During his service, the he received multiple awards, medals, and badges including the following: Iraq Campaign Medal with

two campaign stars, Army Good Conduct Medal, National Defense Service Medal,

Global War on Terrorism Service Medal, Army Service Ribbon, Overseas Service

Ribbon (second award), and Driver and Mechanic Badge. Additionally, he

completed a one-week driver's training course in 2008 and a 12-week wheeled

vehicle mechanic training course in 2009. His rank at separation was E-4 and his

character of service was deemed honorable.  His military service was verified with

a Certificate of Release or Discharge from Active Duty. (PSR Para. 45).

Mr. Watson has one incident on his criminal history from age 17 for which

he believed the record had been expunged after the charges were deferred. (PSR

Para. 27).

He qualified for court-appointed counsel thus, any extraordinary fine

imposed by the Court will be a heavy burden on him.  Additionally, the PSR states

that "[B]ased on the defendant's reduced monthly income and increased monthly

expenses, resulting in a negative monthly cash flow, it does not appear that the

defendant has the ability to pay a fine, in addition to restitution, in the instant

case."  (PSR at page 18).

All of the above personal factors, as well as his law abiding life and his post

arrest behavior, demonstrate he is capable of being a productive citizen, which the

Court can rely on as a basis to sentence him to a short term of confinement to be served on weekends and community service when it considers the §3553 factors.

### C. General Deterrence – 18 U.S.C. § 3553(a)(2)(B) –

### To Adequately Deter Others From Criminal Conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation. The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the U.S. Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves Mr. Watson impoverished when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to be counterproductive, and labeled as political posturing.

### D. Specific Deterrence – 18 U.S.C. § 3553(a)(2)(C) –

### To Protect the Public From Further Crimes Of The Defendant

Mr. Watson's likelihood of recidivism is very low. He has expressed genuine remorse and contrition, has cooperated fully with law enforcement and he accepted the first plea offer tendered with no hesitation. His acceptance of responsibility was complete and without reservation. (See PSR, paragraph 25). Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; See *also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rate were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of

enhancing deterrent effects." *Id.* at 1. Given Mr. Watson's age (34), and other issues consistent with what is mentioned above, the likelihood of Mr. Watson ever re-offending is as close to zero as one might come. A punishment of a period of 15 day incarceration would allow him to receive a just punishment and participate in his adult life by supporting himself at his new job.   Additionally, the alternative of a lengthy prison term, almost guarantees the need to terminate his current relationship with his employer.  This makes much less sense, both for Mr. Watson, and for our nation and does not serve the ends of justice.

## V. The Need To Avoid Unwarranted Sentence Disparities

Mr. Watson urges this Court to readily contrast his behavior from the egregious conduct of other January 6th defendants. Compared to many other misdemeanor cases which have been filed in this Court, Mr. Watson's conduct is among the most peaceful and non-threatening.  He attempted to avoid conflict that day and stayed only a very short time period inside the building when he entered through open doors.   Mr. Watson does not recall all the things he videotaped or said that day inside the Capitol.  In retrospect, after viewing some of them, he is embarrassed by his behavior inside the building, however, his intent was never to deface the building or incite violence or destruction.

As noted herein, the defense is not aware of any evidence that his entry into the U.S. Capitol building was preplanned or coordinated with any extremist or organized group. Mr. Watson did not incite others to commit acts of violence or destruction. He did not engage in any violence or questionable conduct towards law enforcement. Mr. Watson did not destroy or steal any property from the U.S. Capitol building. Based on the Government's own investigation, He remained in a limited part of the building for twelve (12) minutes in total. There is no evidence suggesting that Mr. Watson entered into the Senate or House Chambers or that he even knew what was taking place in those chambers at the time of his entry in to the building.

If this Court were to impose a sentence greater than 15 days of incarceration to be served on weekends, community service, and restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing in this Court. The following cases are a sampling of January 6th U.S. Capitol breach cases, where the defendant(s) plead to 40 U.S.C. § 5104(e)(2)(G), which resulted in no active prison time:

● *United States v. Eliel Rosa*, 21-cr-00068 (TNM) (Oct.12, 2021) (Sentenced to 12 months probation – Mr. Rosa accepted responsibility early on, did not pre-plan or coordinate activities, and did not go far into the U.S. Capital building.)

● *United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (Sentenced to 36 months probation. She was inside the Capital Building and part of a crowd, but was in the back and was pushed out fairly quickly)

● *United States v. Jordan Stotts,* 21-cr-00272 (TJK) (Nov. 9, 2021) (Sentenced to 24 months probation where defendant shouted at MPD officers and posted non-remorseful comments following January 6th.)

● *United States v. Julia Sizer,* 21-cr-00621-CRC (Government requested 2 months home detention however, the Court imposed 24 months probation. She was inside the Capitol Building for approximately 2 minutes and she recorded events on her *cell-ph*one.)

● *United States v. Jacob Lewis,* 21-cr-0100-CRC (Government requested 2 months home detention however, the Court imposed 12 months probation. Mr. Lewis was inside the Capitol Building for approximately 7 minutes.)

● *United States v. Traci Sunstrum,* 21-cr-00652-CRC (Government requested 14 days incarceration however, the Court imposed 30 days home detention. She was inside the Capitol Building for approximately 20 minutes and on 1/6/2021 she posted a brief message as a "citizen journalist.")

● *United States v. Bryan Ivey,* 21-cr-00267-CRC (Government requested 14 days imprisonment however, the Court imposed 60 days home detention. He was inside the Capitol Building for approximately 35 minutes, wave rioters inside, and took multiple videos, which he later deleted.)

● *United States v. Eric Von Bernewitz,* 21-cr-00307-CRC (Government requested 14 days imprisonment, however the Court imposed 60 days home detention. He (and his brother) was inside the Capitol Building for less than 15 minutes.)

● *United States v. Gary Edwards,* 21-cr-00366-JEB (Government requested 14 days imprisonment however this Court imposed 12 months probation. Mr. Edwards was inside the Capital building for approximately 24 minutes.)

● *United States v. Douglas F. Macrae,* 22-cr-00181-JEB (Government requested 4 months home detention however, this Court imposed 12 months probation. Mr. Macrae was in the Capital building for approximately 3 minutes and he posted comments on social media.)

● *United States v. Caleb Jones,* 21-cr-00321-JEB (Government requested 36 months probation with 3 months of home detention however, this Court imposed 24 months probation with 2 months home confinement. Mr. Jones was inside the Capital building for a short period of time)

● *United States v.* Paula Conlon, 22-171-JMC (Government requested 60 days imprisonment, however the Court imposed 12 months probation. Ms. Conlon was inside the Capital building for approximately 3 minutes, and she posted comments & photos to social media.)

There is nothing materially different about Mr. Watson or his conduct which would justify a lengthy sentence of incarceration or probation over the shorter term of 15 days incarceration served on weekends as sought in this case.   Certainly, he should not receive a sentence of both incarceration and probation, commonly referred to as a split sentence.  As this court is no doubt aware, on Friday of last week, the DC Circuit decided *United States v. Little,* No 22-3018 (D.C. Cir. 2023),

ruling that a judge can impose prison time or probation for a Class B misdemeanor (6 month max) but not both, vacating Judge Lamberth's sentence and remanding for a new sentencing hearing for that defendant.  Mr. Watson's charges fall into this category of cases and as such would not be eligible for a sentence of both probation and prison time.  In this case, Mr. Watson wishes to serve his sentence quickly and put this whole episode behind him.  A lengthy period of probation is also something that causes Mr. Watson anxiety as his ADHD creates obstacles to long term planning and follow through.  He has been a model citizen on pre-trial detention, but the anxiety it produced when seeking his new job and traveling for work was difficult to manage.  He would rather know he has paid his debt to society by serving his sentence and moving forward.

.  A term of 15 days incarceration would be in line with other sentences addressing similar conduct and fit the circumstances of Mr. Watson's case on an individual basis, taking into account his personal characteristics and offense conduct that day.

Judges of this district court have sentenced many January 6th misdemeanor cases (for 40 U.S.C. § 5104(e)(2)(G)) to probation or home detention or just a fine. In fact, counsel has recently surveyed cases/sentences when 40 U.S.C. § 5104(e)(2)(G) is the lead count of conviction. (through January 9, 2023).  226

January 6th defendants have been sentenced (following a conviction of 40 U.S.C. § 5104(e)(2)(G)) – 141 sentences (62%) were probation or a period of home detention or a fine, and in 85 sentences (38%) a period of incarceration was imposed.  The nature and circumstances of those offenses involving incarceration, as well as the history and characteristics of the 85 defendants in the § 5104(e)(2)(G) cases resulting in a period of imprisonment longer than 14 day, , are based on far more egregious conduct than the conduct of Mr. Watson – and therefore are readily distinguished.

Mr. Watson was far more cooperative with law enforcement, did not attempt to hide any evidence, did not participate in questionable or violent conduct, and he has not publicly blamed another group for the violence that day. All told, the facts of the offense conduct and characteristics of the defendants who garnered stiff prison incarceration over and above 15 days were different than Mr. Watson's conduct and characteristics. Moreover, Mr. Watson's desire to take responsibility for his actions swiftly and to serve his sentence in a manner that allows him to keep his job, show that he has made a commitment to staying out of trouble and to being a productive and law- abiding member of society.

## VI. CONCLUSION

Mr. Watson respectfully asks the Court to impose period of incarceration not to exceed 15 days and to have that time served on weekends in order to allow him to maintain employment, a period of community service, and restitution of $500. This is largely because: (1) his lack of preparation or planning prior to January 6, 2021, to be part of the U.S. Capitol breach event, and his peaceful, non-destructive and non-violent behavior that day both outside and inside the U.S. Capitol building, (2) his immediate cooperation with law enforcement officers when arrested, as well as his ongoing cooperation and willingness to resolve his case at the earliest opportunity, and (3) to avoid an unwarranted sentencing disparity among similarly situated January 6th defendants.

Mr. Watson requests this court impose the 15 days of incarceration and requests the ability to have them served on weekends so that he may retain his employment in his new state of Tennessee and continue to be a productive and valuable member of society as well as continue to receive the treatment he needs for his ADHD, which has contributed to his ability to retain his job and improve his life.  In the event the Court finds that a longer period of incarceration is warranted, Mr. Watson asks that he be allowed to serve it as well on weekends near his home in Nashville, TN.

Imposition of a fine is discretionary, and, defendant respectfully submits, he should not be ordered to pay a fine in this case. Defendant's financial condition (discussed herein) is such that he cannot pay any significant (additional) fine. He will, of course, remit the agreed upon $500.00 restitution and the $10.00 special assessment.

For the foregoing reasons and such other reasons that may appear just and proper, Mr. Watson respectfully asks this Court to fashion a sentence 15 days incarceration served on weekends, with community service hours and payment of $500 restitution. This sentence is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a). It would be a sentence in the best tradition of federal judicial discretion, which will consider Mr. Watson as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,

By: Nicole Cubbage

/s/  *Nicole Cubbage*

Nicole Cubbage
DC Bar No. 999203
712 H. Street N.E., Unit 570
Washington, D.C.  20002
703-209-4546
cubbagelaw@gmail.com
Attorney for Jesse Watson

Certificate of Service

I certify that a copy of the forgoing was filed electronically for all parties of record on this 22nd day of August, 2023.

____/s/  *Nicole Cubbage*_____

Nicole Cubbage