**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-87 (RBW)** |
| **v.** | : | |
| | : | |
| **JESSE WATSON,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jesse Watson to 45 days of imprisonment, 60 hours of community service, and $500 in restitution.

## I.     Introduction

Defendant Jesse Watson, a 34-year-old associate at a security company, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Watson pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 45 days of imprisonment is appropriate in this case because Watson: (1) witnessed violence on the West Front of the Capitol before entering the building; (2) filmed himself entering the Capitol Building, capturing images of broken glass and also barricades used by U.S. Capitol Police to prevent entry; (3) attempted to deface the Crypt of the U.S. Capitol Building—even after U.S. Capitol Police had stopped him; (4) filmed and encouraged various acts of disorderly conduct in the Capitol, including smoking marijuana and cigarettes, loud chanting and demonstrating, and suggesting that people relieve themselves in the Building; and (5) joined a crowd attempting to make a second entry to the U.S. Capitol after he was expelled. Watson's actions on January 6 evinced a total disregard for the U.S. Capitol Building and a complete lack of respect for the U.S. Capitol Police who attempted to defend and protect it.

The Court must also consider that Watson's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Watson's crime support a sentence of 45 days of incarceration.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7.

### Defendant Watson's Role in the January 6, 2021 Attack on the Capitol

Watson and his co-defendant, Tucker Weston, flew from Seattle to Washington, D.C. on January 5, 2021. After his arrival, Watson checked into the ARC The Hotel in D.C.

On the morning of January 6, 2021, Watson attended the "Stop the Steal" rally at the Ellipse. After attending the rally, Watson marched with other protestors towards the grounds of the U.S. Capitol. Although Watson and Weston traveled together, they did not spend much time together on January 6.

Watson entered the Restricted Area on U.S. Capitol grounds after 1:00 p.m. and positioned himself near the front of rioters confronting the police line formed by both Metropolitan Police and USCP officers. Watson stayed within the Restricted Area for roughly two hours before entering the Capitol Building through the Senate Wing Door at approximately 3:09 p.m.



*Image 1: Watson (circled in yellow) on the Restricted Grounds of the U.S. Capitol*



*Image 2: Watson entering the U.S. Capitol through the Senate Wing Door*

3

While on the Restricted Grounds, Watson recorded a long video on his cellphone, and it captured approximately nine minutes of the time Watson spent inside Capitol Building. As seen in the video, when Watson entered through the Senate Wing Door, he saw broken glass panes, including broken glass with what appears to be blood on it, and an "Emergency Exit Only" sign posted to the door. (*See* Images 3 and 4 below).[2]

 

***Images 3 & 4: Screenshots from Watson's video of broken glass in the Senate Wing Door (Sentencing Ex. A at 0:16 and 0:18)***

In that same video, a loud fire alarm could be heard blaring over the noise of the crowd. Once inside of the Capitol, Watson turned right and walked down a hallway toward the Crypt. Watson could be heard in his video, at various times, speaking with other rioters about what they accomplished. One rioter commented to Watson, "If I wasn't on a list before, I am now," to which Watson responded, "Right? Fuckin' 'A' man." (Sent. Ex. A, at 0:55). While Watson walked

---

[2] Watson's cell phone video is Exhibit B in the government's sentencing exhibits. The time stamps next to the image captions or following events in the memo reflect where in the 9+ minute video those screen shots were obtained.

toward the Crypt, Watson stopped in Senator Merkley's hideaway office, just off the Senate Wing Door hallway, which was overrun by rioters, and asked "Are you guys smoking reefers in here?", to which another rioter responded, "They were." Watson jokingly responded, "That's not appropriate." While still in the office, Watson identified a map of Oregon on the wall and commented, "It would be dope to get one of those. . . Man I could take that, never mind, it's not right." (Sent. Ex. A, at 1:49).

At approximately 3:12 p.m., Watson entered the Crypt with a cell phone in his hand, raised above his head. While in the Crypt, Watson filmed a police officer stop a rioter from hanging a blue "TRUMP" flag on the wall of the Crypt.



*Images 5 & 6: Watson filmed a rioter trying to hang a "TRUMP" flag in the Crypt (Sentencing Ex. A at 4:18 and 4:24)*

Upon seeing this interaction, Watson walked to the rioter and asked "what do you got?," and after briefly speaking with him, stated "lets do it." Watson held the flag up to the pillar while

the rioter tried to tape it up. As two police officers approached to stop them, Watson quickly tried

to hang the banner on a piece of black tape before walking away.



*Images 7 & 8: Watson's video as he assisted another rioter to hang a flag in the Crypt.*
*(Sentencing Ex. A at 4:57 and 5:11)*



*Image 9: Watson hanging a flag in the Crypt*

Watson then walked around the Crypt before approaching a group of rioters who were

smoking. Watson commented "smoking is cool, dog," and laughed at other rioters praising one

of the smokers.



*Image 10: Watson approaching a group of smokers in the Crypt (Sent. Ex. A at 6:38)*

Watson then tried to find the masked rioter with the blue flag, and asked "What happened to my dude with the fuckin' uh Trump flag? I was gonna try to help him put it up again." (Sent. Ex. A, at 7:53). While still in the Crypt, Watson also yelled at various points, "USA, USA."

Watson  tried to access other parts of the Capitol Building, but upon seeing police officers blocking a hallway commented, "I don't think they like that, they seem angry." (Sent. Ex. A, at 8:40). Before leaving the Crypt, Watson turned the camera around on his phone and posed for a selfie with a bust of President Lincoln and gave a "thumbs up."



*Image 11: Watson posing for a selfie in the Crypt (Sent. Ex. A at 9:10)*

Watson left the Crypt and walked back toward the Senate Wing Door. Watson arrived in the Senate Wing Door hallway and saw many police officers, prompting him to comment "uh oh." (Sent. Ex. B, at 0:49). At approximately 3:21 p.m., Watson exited the U.S. Capitol through a broken window next to the Senate Wing Door. Watson recorded his exit, capturing the broken glass and shattered panes of the window. (Sent. Ex. B, at 1:37).



*Image 12: Watson exiting the U.S. Capitol through a broken window*

After exiting the Capitol Building, Watson made his way to the North Door and joined in a crowd that attempted to breach that door. (Sent. Ex. C, video from Watson's phone that captures part of his time at the North Door). While at the North Door, Watson witnessed rioters engage with police officers protecting the door and discussing their violent interactions with police, including stories of getting maced. After that attempt was unsuccessful, Watson stayed on Capitol Grounds for over an hour before finally leaving.

*Watson's Text Messages and Note to Self After January 6*

After the attack on the Capitol, Watson texted with an acquaintance about his reason for going to D.C. and what he witnessed while on Capitol grounds. Watson admitted that police officers "tried to grab me when I walked past them." (Ex. D). Additionally, Watson stated that "if I had to put a cause to [going to the Capitol], it would be lack of investigation to unusual election processes." (*Id.*).

Watson also drafted a note on his phone titled "My motivation for going to dc" [sic]. (Ex. E). In his note he stated that "i [sic] wanted the government to be able to see how many people were upset about the way the election was run." He attended the "Stop the Steal" rally held on the Ellipse where he heard Trump speak and expected him to "release the kraken." As he made his way from the Ellipse to the Capitol, Watson noted that some people chanted "FUCK ANTIFA," which he thought was odd because "there didn't seem to be any antifa [sic] about. . . ."

Watson stated that by the time he made it to the "back yard" of the Capitol (the government believes Watson was referring to the West Front), he saw "some black railing that had been ripped out of the ground and plastic anchors exposed." He stated further, "At this point it was clear that the crowd was pushing toward the building. . . . There was no way these people were going to move forward, the police would start to tear gas, beat and arrest people soon," revealing his knowledge that the crowd was not supposed to be where it was. Watson "took up the energy of the crowd as I moved through the less aggressive portions of it. We were there to make noise. . . . As we headed around the side I saw people fighting with cops on the stairs getting maced and beaten."

Before entering the Capitol Building, Watson stated that he walked past a window and "saw someone breaking it from the inside. This is fucking crazy. . . . [T]he people inside are definitely going to jail." Watson witnessed "[p]eople. . . being ushered out of a side door by police

while the back door and the window next to it are being used freely and calmly as an entry/exit." He then stated he went inside because he "was exited [sic], this shows the mucky mucks they can be touched when they screw us over."

*The Charges and Plea Agreement*

On October 18, 2022, the United States charged Watson by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 19, 2022, law enforcement officers arrested him at his home in Washington State. On March 17, 2023, the United States charged Watson by a four count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On May 12, 2023, pursuant to a plea agreement, Watson pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Watson agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Watson now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Watson faces up to six months of imprisonment and a fine of up to $5,000. Watson must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 45 days imprisonment.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at \*5 (D.D.C. Dec. 28, 2021). While assessing Watson's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Watson, the absence of violent or destructive acts is not a mitigating factor. Had Watson engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors here is Watson's knowledge of the mob's purpose in breaching the Capitol Building combined with his personal reason for traveling to D.C. on January 6. In a note entitled "My motivation for going to dc [sic]," Watson explained why he went to the Capitol on January 6, what he did while there, and what he thought they accomplished. Tellingly, Watson was aware of Congress's purpose for meeting on January 6 and mentioned in his note how he heard that Pence certified the vote. Indeed, that news spurred him on to show the "mucky mucks" that he was angry and believed that the election was stolen.

A second factor warranting the government's recommendation is the violence Watson witnessed and his subsequent actions. Watson approached the Capitol Building from the West Front, an area where the most violent acts of the day took place. Indeed, Watson acknowledged the scene he came upon when arriving at the Capitol, "I arrived at the [West Front] of the capitol [sic] and found a large group surrounding the stairs. . . . At this point it was clear that the crowd was pushing toward the building. . . . As we headed around the side I saw people fighting cops on

11

the stairs getting maced and beaten." Beyond the violence witnessed, Watson also saw severe destruction of property, including a man breaking a window of the Capitol Building from the inside and the broken glass of the Senate Wing Door he filmed as he entered the Capitol Building.

Once inside, Watson observed even more raucous and destructive behavior, and he encouraged it. He filmed people smoking, ransacking Senator Merkley's hideaway office, and he helped another rioter hang a banner in the Crypt.

Finally, Watson did not leave the Capitol Building willingly, nor did he leave the Grounds once expelled. Instead, Watson joined a crowd attempting to break through the North Door.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 45 days imprisonment in this matter.

### B.  The History and Characteristics of Watson

As set forth in the PSR, although Watson has no criminal convictions, he has been arrested on criminal charges for arson of a vehicle as a minor. This arrest did not result in a criminal conviction. Watson has been compliant with the conditions of his release. Watson's PSR also reports military service between 2008 and 2012, when he was honorably discharged.

While Watson's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military member, Watson was acquainted with secure areas and restricted government buildings. His voluntary decision to storm a guarded government building is nothing short of shocking in light of his former military service and training. Further, Watson is—and was on January 6—employed by a security company as a systems installer and so had ample training and experience to help him realize that the rioters in the Capitol were not supposed to be there. Not the least of which was the blaring fire alarm that can be heard as Watson enters the Senate Wing door. (Ex. A, at 0:20).

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Watson knew that going into the Capitol was wrong. He witnessed violence between rioters and police prior to entering the Capitol. He witnessed rioters vandalizing the interior of the Capitol before entering. He witnessed rioters escorted out of the Capitol before entering. Watson even stated after January 6 that police officers tried to "grab him" and he knew the people inside the Capitol were not supposed to be there. Despite these warning signs, Watson still decided to enter the building to show "the mucky mucks they can be touched when they screw us over." Indeed, while in the Capitol, Watson witnessed and encouraged disruptive behavior, including filming other rioters smoke cigarettes and marijuana in the Crypt and the ransacking of a senator's office, and actively helping another rioter hang a flag even after being explicitly directed by law enforcement to not do so.

14

Watson's desire to send the "mucky mucks" a message on January 6-- no matter the cost—caused Watson to repeatedly disregard rule of law and cavalierly ignore police efforts to secure the Capitol Building. His willingness to join in and encourage the destructive behavior of the mob was not momentary or fleeting; Watson was at the front of a mob confronting police for over two hours before he finally entered the Capitol.  And after he left the Capitol Building, rather than leave, Watson walked to the North Door where he joined a mob trying to create a new breach. A term of incarceration is necessary for Watson to achieve the goals of sentencing and specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Watson based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Watson has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, Picketing in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a),

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in

the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented

that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject

to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those

cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases

as the closest "comparators" when assessing unwarranted disparity. But nothing in Section

3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases,

even those involving similar criminal conduct and defendant's records. After all, the goal of

minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several

factors that must be weighted and balanced," and the degree of weight is "firmly committed to the

discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may

have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a)

factors differently; and every sentencing decision involves its own set of facts and circumstances

regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C.

Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the

Sentencing Guidelines range, differently from the sentence an appellate court might have imposed,

and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

It follows that a sentencing court in a Capitol siege petty offense case is not constrained by

sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272

(TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the

sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Bronsburg*, 22-cr-144, the defendant entered the Capitol through the Senate fire door after hearing other rioters shout and encourage the group to move forward. Despite leaving about half a minute later, Bronsburg re-entered the Capitol 20 minutes later through the Senate Wing Door. Staying for about ten minutes, Bronsburg took photos and videos on her phone as she walked through the Capitol and into Senate room S145. After leaving the Capitol, Bronsburg bragged about breaching the building and posted a video to Facebook she had taken while inside. Like Watson, Bronsburg pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). The government recommended 30 days of incarceration, 36 months' probation, 60 hours community service, and $500 in restitution. This Court sentenced Bronsburg to 20 days of incarceration, 24 months' probation, and $500 in restitution.

In *United States v. Morrissey*, 22-cr-660, the defendant entered the Capitol through the Rotunda door and remained inside for approximately 28 minutes. After entering, Morrissey proceeded through the Capitol's Statuary Hall to Will Rogers Hallway, ultimately arriving at the House main door where he and other rioters protested outside. While inside the Capitol, Morrissey took photographs, captured videos, and loudly chanted along other rioters. Like Watson, Morrissey pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). The government recommended 14 days of incarceration, 36 months' probation, 90 days of home confinement, 60 hours of community service, and $500 in restitution. This Court sentenced Morrissey to 45 days of incarceration, 36 months' probation, a $2,500 fine, and $500 in restitution.

In *United States v. Castro*, 22-cr-299, the defendant initially returned to her hotel room after the January 6th rally. However, after seeing reports on the news about rioters amassed at the

Capitol, Castro, her husband, and another individual left the hotel to join the mob at the Capitol. Like Watson, Castro filmed herself entering the Capitol, but Castro did so through a broken window using the platform built for the inauguration of President Biden. Castro climbed into room ST-2M of the Capitol while narrating to the camera, "I'm going in. I'm going in the Capitol. We're in! We're inside the Capitol house. We got inside the Capitol." Castro continued to film videos from inside the Capitol and on restricted grounds declaring, "We're coming" and "this is war." Like Watson, Castro pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). The government recommended 60 days of incarceration and $500 restitution. This Court sentenced Castro to 45 days of incarceration and a $5000 fine.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Watson must pay $500 in restitution, which reflects in part the role Watson played in the riot on January 6.[5] Plea Agreement at ¶ 10. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Watson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 64.

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Jesse Watson to 45 days of imprisonment, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Kyle M. McWaters*
Kyle M. McWaters
Assistant United States Attorney
D.C. Bar No. 241625
601 D Street NW
Washington, DC 20003
(202) 252-6983
kyle.mcwaters@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 22nd day of August, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>*/s/ Kyle M. McWaters*</u>
Kyle M. McWaters
Assistant United States Attorney
D.C. Bar No. 241625
601 D Street NW
Washington, DC 20003
(202) 252-6983
kyle.mcwaters@usdoj.gov